(September 28, 1908.)

JESSE J. WALLING, Plaintiff, v. ROBERT LANSDON, Secretary of State of the State of Idaho, Defendant.

[97 Pac. 396.]

POLITICAL PARTIES—FACTIONS—JURISDICTION OF COURTS — PRIMARY ELECTION LAW—LEGAL RIGHTS—RIGHTS OF A MAJORITY OF LEGAL DELEGATES—AUTHORITY OF STATE COMMITTEES AND STATE CONVENTIONS.

1. Courts will not undertake to control the internal affairs of a political party, unless the same encroaches upon, violates or contravenes the law.

2. In an application for a writ of mandate to compel the secretary of state to file a certificate of nominations as the Democratic state ticket, when his answer thereto denies the allegations of the petition and alleges that the convention making such nominations was not the regular Democratic state convention, a general demurrer to the answer will be overruled.

3. The act known as the primary election law (Laws 1903, p. 360) is mandatory, and applies to and governs all political parties not therein specifically excepted.

4. Every right conferred upon a voter at a primary election held under this law is a legal right which may be protected, defended and enforced by appropriate legal methods in the courts of this state.

5. In determining factional disputes in a political organization and the legality of party primaries and conventions, the courts will go as far. as the law goes, and protect all legal rights conferred by law upon all persons participating therein.

6. Where the legislature of the state has regulated the method and manner of holding primary elections, the selection of delegates and the conduct and duty of conventions, the courts will not be governed or controlled by the action or decision of the party authorities in such matters, but will determine and protect the legal rights of the citizen participating therein.

7. In a contest between two factions of a political party as to which is the regular organization and entitled to represent the party, the court will look to the law, and if the matter is regulated by law, the respective rights of the factions will be determined by the law. If, however, there is no law governing the rights of the contesting factions, the same will be relegated to the party forum.

8. Party conventions, committees or the party authority cannot decide or determine a matter which is regulated by law, and thereby abrogate the law or oust the courts of jurisdiction to hear and determine such matter.

9. In the absence of a statute of this state in relation thereto, a party state central committee has such authority and power as may be given it by the authority creating it, or as is generally exercised by such committees, and may make up a temporary roll of delegates who are entitled to sit in the temporary organization of a state convention, but in so doing can only place on such roll legal delegates.

10. A party state committee or a party state convention is not superior to the laws of this state, and neither can make rules and regulations in violation of the law, or confer rights or privileges upon persons not elected according to law, or deny rights · or privileges to persons elected according to law.

11. A party state committee or a party state convention has no power or authority to seat or recognize as members of such convention, delegates not elected to such convention according to the law, or deny the right to sit or participate therein to delegates elected according to the law.

12. The primary election law of this state provides two methods of electing delegates to a state convention: 1st. By a direct vote at such primary for such delegates; 2d. By a convention composed of delegates elected at a primary held under the law; and delegates cannot be legally elected to a state convention in any other manner than as directed by this statute.

13. A minority of legal delegates elected to a state convention cannot combine with illegal delegates, and thereby constitute such legal minority a legal majority, and thereby govern and control a convention, and deny the right to sit or participate therein to delegates elected according to law.

14. A majority of the legal delegates elected to a state convention under the primary election law of this state has the power and authority to organize and control the convention to which they are elected, and may take such steps and adopt such methods, not in violation of law, as will give to such majority a right to organize and act for and as the convention.

15. A minority of legal delegates elected to a state convention has no right or authority to combine with illegal delegates, and thereby deprive the legal majority elected to such convention of the right to organize and control the convention; and if, by so doing, the legal majority is denied such right, it may organize the convention in the same hall or elsewhere, and will be recognized as the legal convention.

16. The proceedings of a party convention composed of legal delegates will be recognized as the proceedings of the regular party convention, in preference to the proceedings of a convention composed partly of legal delegates and partly of illegal delegates, if it appears that a majority of the legal delegates participated in and controlled the former convention.

(Syllabus by the court.)

Original proceeding for writ of mandate.

Henry Z. Johnson, R. H. Johnson, T. D. Cahalan, S. H. Hays, M. G. Cage, A. T. Ryan, A. A. Fraser, and C. H. Jackson, for Plaintiff.

The only question to be determined by the court is which of the two tickets in controversy is the ticket nominated by

the convention called by the regular state central committee of the party. (*Williams v. Lewis,* 6 Ida. 184, 54 Pac. 619; *Addle v. Davenport,* 7 Ida. 282, 62 Pac. 681.)

The course pursued by the state committee in this case in organizing the convention is the one adopted by the national conventions of both parties, and has been approved in *State ex rel. Howels v. Metcalf,* 18 S. D. 393, 100 N. W. 923, 67 L. R. A. 331.

The fact that a contesting delegation voted upon the question of the title to seats in the convention did not vitiate the judgment of the convention where, as in this case, the evidence disclosed that a clear majority of all the delegates present voted in the affirmative, without including the contesting delegation. (*State ex rel. Gilchrist v. Weston,* 27 Mont. 185, 70 Pac. 519.)

The convention is clearly the judge of the qualifications and election of its members, and the court will not decide such questions in the absence of statutory provisions relating thereto. (*State ex rel. Mitchell v. Larson,* 13 N. D. 420, 101 N. W. 315; *State v. Lavik,* 9 N. D. 461, 83 N. W. 914.)

Judicial inquiry is limited to ascertaining and determining the *identity of the party* convention, and not to an examination of methods or tactics. (*State v. Porter,* 11 N. D. 309, 91 N. W. 946; *State v. Liudahl,* 11 N. D. 320, 91 N. W. 955; *State v. Board of Election Commrs.,* 167 Ind. 276, 78 N. W. 1018.)

The court will take notice of the fact that by party usage and custom the state central committee has the power to pass upon the claims of contesting delegations. (*State v. Falley,* 9 N. D. 450, 83 N. W. 863.)

The withdrawal of the several delegates from the convention did not dissolve the convention, or destroy its identity, or deprive it of the power of proceeding with the business for which it convened. (*Hutchinson v. Brown,* 122 Cal. 189, 54 Pac. 738, 42 L. R. A. 232; *State v. Porter,* 11 N. D. 309, 91 N. W. 946.)

The defense set up "that if the majority remained in said hall and attempted to assert their rights, riot and bloodshed

would result, and many of their members be injured and killed,'' and they therefore withdrew from the convention, is ludicrous. (*State v. Metcalf*, 18 S. D. 393, 100 N. W. 926, 67 L. R. A. 331.)

J. H. Hawley, Karl Paine, G. W. Tannahill, John F. Nugent, F. E. Fogg, J. T. Pence, K. I. Perky, and John C. Rice, for Defendant.

The court has jurisdiction to go into the merits of the controversy and determine which of the two tickets nominated at Wallace is entitled to be printed upon the official ballot as the regular Democratic ticket. (*State v. Houser*, 122 Wis. 534, 100 N. W. 964; *State v. Falley*, 9 N. D. 450, 83 N. W. 860; *Williams v. Lewis*, 6 Ida. 184, 54 Pac. 619.)

Political parties have the same power to determine purely political questions and matters of party procedure, in the absence of legislation, that they always had, but when the legislature essays to regulate any matter, questions arising out of such legislation are legal and not political, and the courts are bound to determine them. (*State v. Metcalf*, 18 S. D. 393, 100 N. W. 923, 67 L. R. A. 331; *Ladd v. Holmes*, 40 Or. 167, 91 Am. St. Rep. 457, 66 Pac. 714; *Neal v. Young*, 25 Ky. Law Rep. 183, 75 S. W. 1082; *State v. Hogan*, 24 Mont. 383, 62 Pac. 587; *State v. Martin*, 24 Mont. 403, 62 Pac. 590.)

Since the case of *Williams v. Lewis*, *supra*, and that of *Addle v. Davenport*, 7 Ida. 282, 62 Pac. 681, were decided by this court, our legislature has seen fit to enact a primary election law. We think it intended to provide that delegates duly elected in accordance with that statute shall be entitled to seats in the convention to which they are accredited. (*People v. Democratic General Committee*, 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 677.)

While the rule is universal that, in the absence of legislation, a political convention is the judge of the qualifications and election of its members, its operation is restricted in this state by that other rule that political parties can-

not evade, ignore or violate a statute. (*Neal v. Young, supra; State v. Rexford* (S. D.), 109 N. W. 217.)

The fact that the statute provides that delegates elected under the provisions thereof to the county convention may select delegates to the state convention, implies that after the statute has been invoked, delegates to a state convention chosen in the statutory way are qualified to sit therein, and that delegates elected by any other body or selected in any other way are not so qualified.

What the legislature makes lawful a political convention cannot make unlawful. (*State v. Hogan, supra; Neal v. Young, supra; Ladd v. Holmes, supra.*)

Under the Australian ballot law alone the majority had, and now has, a right to name the ticket, and a legal right to name it. (*State v. Smart,* 24 Mont. 413, 62 Pac. 593.)

We are here asking the court in this case to exercise its power, to assume jurisdiction of the controversy, to prevent the consummation of a fraud—a fraud conceived and executed with the deliberate aim of subverting the legal right of the majority to name the party ticket. (10 Am. & Eng. Ency, 2d ed., 660; *Williams v. Lewis, supra; State v. Lesueur,* 103 Mo. 253, 15 S. W. 539; *Spencer v. Maloney,* 28 Colo. 38, 62 Pac. 850; *Whipple v. Broad,* 25 Colo. 407, 55 Pac. 172; *Allen v. Burrow,* 69 Kan. 812, 77 Pac. 555; *Fairchild, In re,* 151 N. Y. 359, 45 N. E. 943; *In re Pollard,* 25 N. Y. 172; *Allen v. Burrow,* 69 Kan. 812, 77 Pac. 555; *In re Fairchild,* 151 N. Y. 359, 45 N. E. 943; *In re Pollard,* 25 N. Y. Supp. 385; *French v. Roosevelt,* 41 N. Y. Supp. 1080, 18 Misc. Rep. 307; *Jennings v. Board of Election Commrs.,* 137 Mich. 720, 100 N. W. 995; *Beckwith v. Rucker,* 28 Colo. 31, 62 Pac. 836; *In re Woodworth,* 16 N. Y. Supp. 147, 19 N. Y. Supp. 525, 46 N. Y. St. Rep. 432; 15 Cyc. 332.)

What was the highest tribunal in the Democratic party, according to party usage, when the two factions came to the parting of the ways at Wallace? We answer, a majority of the duly elected and uncontested delegates in the convention. Our opponents say, the temporary chairman and the state central committee. We maintain that the state

committee died with the convening of the convention. (*State v. Falley, supra.*)

STEWART, J.—This is an application for a writ of mandate to compel the defendant, as secretary of state, to file and certify to the various county auditors within the state the nominations certified and presented by Albertus L. Freehafer and John W. Constan, claiming to be chairman and secretary, respectively, of the Democratic state convention of the state of Idaho, held at Wallace, Idaho, August 4, 1908, and to strike from the files of his office the nominations certified and presented by J. L. McClear and F. G. Burroughs, claiming to be chairman and secretary, respectively, of the Democratic convention held at Wallace, Idaho, August 4, 1908. The petitioner was nominated for the office of secretary of state by the convention presided over by Albertus L. Freehafer, and brings this action on behalf of himself and the other nominees of said convention.

The petition, among other things, alleges that at a state convention of the Democratic party, held at Coeur d'Alene City, in the state of Idaho, on August 6, 1906, a state central committee was elected to act until their successors were chosen, and organized by the election of H. W. Lockhart, one of its members, as chairman, and C. E. Arney as secretary; that said state central committee met at Boise City, Ada county, Idaho, on February 27, 1908, at which meeting a call was made for a state nominating convention of the Democratic party, to be held at Wallace, Idaho, commencing August 4, 1908; that thereafter, on August 3, 1908, said state central committee met at the city of Wallace for the purpose of deciding any contests and preparing a temporary roll for said state nominating convention, and at such meeting a quorum of the duly elected members being present, said committee duly and regularly prepared a list of those delegates to said state convention who were entitled to participate in the temporary organization; that said convention met on the 4th day of August, and because of no quorum, adjourned until the 5th day of August, at which time it was

duly convened, and those entitled to participate in the temporary organization were present and took part therein, and said convention organized and nominated presidential electors, a member of Congress, and candidates for the various state offices; that at such convention, a majority of the qualified delegates participated in making such nominations; that the petitioner was nominated for the office of secretary of state; that an emblem was adopted by said convention for the party, and such proceedings thereafter had that a certificate was made in writing, as provided by law, signed by Albertus L. Freehafer, the presiding officer, and John W. Constan, as secretary, and that such certificate of nomination was delivered to the defendant as secretary of state, who was requested to file the same, and to certify the same to the county auditors of each county as provided by law, but that said secretary of state failed and refused to file the same, for the reason, as claimed by him, that another certificate purporting to contain the Democratic state ticket had already been accepted and filed; that the Democratic convention at which the petitioner was nominated was the regular state Democratic nominating convention of the Democratic political organization, and that the nominations made by the convention, the certificate of which nominations was accepted and filed by the defendant, was composed of a minority of the delegates elected to the Democratic state convention, who withdrew therefrom and held a separate convention, which was not the Democratic convention.

The answer, after denying the allegations of the petition, alleges at length that after the election and organization of the Democratic state central committee in 1906, a conspiracy was entered into between Fred T. Dubois, who, it is alleged, had a controlling influence over a majority of said committee, and H. W. Lockhart, the chairman of said committee, and C. E. Arney, the secretary, together with C. H. Jackson and others, as members of said committee, for the purpose of securing control of the Democratic organization and the Democratic party within the state of Idaho; and, to carry out said conspiracy, C. E. Arney was added as a member of the

state central committee from Ada county in place of Joseph H. Hutchinson, the duly elected member from said county, and that one Joseph McCart, a political friend and supporter of Dubois, was appointed as a member of said committee by Lockhart, chairman, from Bear Lake county, without any authorization from the state central committee or the Democratic committee of said Bear Lake county; and that one C. H. Porter, a strong friend of said combination, and under the control of the same, was appointed as a member of said committee from the county of Blaine in the place of J. W. Ballentine, the regularly elected member, deceased, and that during the year of 1907, in furtherance of said conspiracy, said Lockhart appointed as members of said state central committee, without authority, certain persons to represent the counties of Twin Falls and Bonner, newly created counties by law after the election of said state central committee; that the committee, under the influence of said conspirators, selected Wallace as the place of meeting of said state convention, by reason of the fact that said conspirators had control of the party machinery in said county, and that the Democrats of said county were in sympathy with said conspirators, and by reason of which much influence could be brought to bear upon the action of the convention; that said conspirators, as a means of defeating the will of the majority of the Democratic party in the southeastern part of the state, and to enable persons not elected as members of the state convention to be seated as delegates therein, induced said committee to invite what was known as and called the "American party," a political organization other than and different from the Democratic party and a separate political organization, to send delegates to said convention; that said state central committee was convened at Wallace on August 3, 1908, and was induced by the parties to said conspiracy, and in furtherance of the design of the same, to take up and decide all contests between persons and delegations professing to represent the several counties of the state and prepare a temporary roll for said state convention, and pointed out and decided who were entitled to seats and votes in said

convention; that this action of the state central committee was in violation of the custom and usages of said party, which had been not to permit contesting delegations to in any manner participate in the deliberations of the organization of the convention except as spectators, or take part in the proceedings of such convention until the convention had decided which of said contesting delegations were entitled to seats therein; that said committee made up a temporary roll of delegates entitled to seats in the convention, and refused and denied the delegates from Ada county a place on said temporary roll, and placed on said temporary roll the delegations representing the Dubois faction from the counties of Bear Lake, Fremont, Bingham and Oneida, without any hearing or receiving any evidence as to the regularity or legality of the election of such delegates, and denied the regularly elected delegates from Bear Lake, Bingham, Fremont and Oneida seats in said convention or the right to participate in the temporary organization thereof; that the convention was temporarily organized by the election of one Glenn McKinley as chairman, a friend and supporter of the alleged conspirators, and after the election of a temporary secretary, a committee on credentials was appointed, one member from each county except the county of Ada, which was denied and refused a representation thereon; that from the delegates from the counties of Bear Lake, Bingham, Fremont and Oneida, which had been given seats in said temporary organization, over the legally elected delegates therefrom, a member from each of said counties was placed upon said committee on credentials; that the committee on credentials so appointed was under the influence and control of the said conspirators; that said committee on credentials met, took up the several contests, and decided that the regularly elected delegates from Ada county were entitled to seats in the convention, but that the regularly elected delegates from Bear Lake, Bingham, Fremont and Oneida were not entitled to seats, but that the opposing and contesting delegations belonging to the Dubois faction were entitled to seats therein; that a majority of the legally elected delegates to said

convention who were members of said committee on credentials was opposed to the action of the committee; that a report was made by said committee which was signed, among others, by the members of the contesting delegations from said Bear Lake, Bingham, Fremont and Oneida counties, reporting the action of said committee, and that a majority of the legally elected delegates and members of said committee asked leave to present a minority report; that. the temporary chairman refused· to permit the minority report to be presented or read; that the previous question was moved by C. H. Jackson, a member of said conspiracy, and rollcall was ordered upon the motion for the previous question; that the secretary declined to call Ada county or to permit the delegates therefrom to vote, but did call the counties of Bear Lake, Bingham, Fremont and Oneida, and delegates representing the Dubois faction, and who were illegally elected thereto, were recognized and permitted to vote upon said motion; that members of said convention whose seats were undisputed, attempted to appeal from the decision of the chair in permitting the delegates from said Bear Lake, Bingham, Fremont and Oneida counties to vote, and said chairman refused to entertain said appeal, and directed the sergeant-at-arms ·to remove all persons attempting to take an appeal; that the previous question was declared by said chairman to be carried, when in truth and in fact the same was not so carried by a majority of the legally elected delegates of said convention; that about this stage of the proceedings the following delegations withdrew from said convention, to wit: Ada county, 31 delegates; Blaine county, 11 delegates, the delegation being under the unit rule, seven of whom attended the convention, one of whom returned home before the division occurred, and the remaining six withdrew from said convention; Boise county, 10 delegates, the delegation under the unit rule, four of whom attended the convention and three withdrew and one remained; Canyon county, 28 delegates; Cassia county, 3 delegates; Elmore county, 8 delegates; Kootenai county, 15 delegates; Lincoln county, 8 delegates, five of whom attended the convention and two of

whom withdrew, that delegation not being under the unit rule; Nez Perce county, 21 delegates; Owyhee county, 7 delegates; Twin Falls county, 9 delegates, six of whom attended the convention and one of whom withdrew, the delegation being under the unit rule; that the delegates withdrawing were a majority of the duly and legally elected delegates to said convention; that said delegates so withdrawing organized a convention, elected J. L. McClear chairman and F. G. Burroughs as secretary, adopted a platform of principles, a party emblem, and nominated the ticket filed and accepted by the defendant as the Democratic state ticket.

Upon the hearing of the demurrer, it was conceded and agreed that where delegations were under the unit rule, that such unit rule was the action of the convention selecting such delegates, and was a direction that such delegation vote as a unit. It was further agreed that the delegates withdrawing, organized a convention by the election of J. L. McClear as chairman, and F. G. Burroughs as secretary, and proceeded to make nominations which resulted in nominating the candidates certified to by said McClear and Burroughs, and which certificate of nomination was filed by the defendant in this case as the nominations of the Democratic party of the state of Idaho, to be placed upon the official ballot according to law. The delegations not withdrawing from said convention proceeded to make nominations and nominated the ticket certified to by Albertus L. Freehafer as chairman, and John W. Constan as secretary, which it is sought in this action to have filed and placed upon the official ballot as the legal Democratic ticket of the state of Idaho.

The plaintiff demurred to the answer upon general grounds. Upon the argument of the demurrer, it was contended by the plaintiff that the allegations in the answer with reference to a conspiracy and fraud were immaterial, and presented no questions or issues which the court would consider; that such matters, even if true, were matters entirely of a political nature, and that the settlement of the same should be in the party forum.

We are inclined to take this view of the effect of these allegations. We are not inclined to inquire, as between two contending political factions of a party, whether or not the leaders of either faction combined and conspired together, for the purpose of securing control of the political organization, except in so far as the acts of such parties and the legality of the result accomplished by them, may be governed by the laws of the state. We know of no statute in this state which prevents members of a political organization from combining together and using their influence upon other members with a view of securing the adoption of certain political policies or the nomination of certain men as candidates for offices. As a rule, policies adopted by political parties are the result of the combined efforts and judgment of a few of the leaders of such political organization, and whatever evils may result from such combinations must be corrected within the party itself, as the courts will not undertake to regulate or control the internal affairs of a political organization. When, however, in carrying out the purposes of such combination, or controlling the affairs of a political party, the actors therein encroach upon, violate or contravene the laws of the state, then and at such time the courts will, in a proper proceeding, arrest such action and enforce the laws of the state. Whether or not Ex-Senator Dubois and others conspired for the purpose of gaining control of the Democratic party and adopting and carrying out certain policies therein, is not a question which will demand consideration by this court. If, however, in accomplishing such purposes, the acts or methods adopted are in contravention of the laws of this state, then the court has power and jurisdiction to arrest and control such actions in so far as to keep the same within the limits of the law.

The answer denies the allegations of the petition, and alleges affirmatively that the delegates composing the convention presided over by McClear were elected according to the laws of this state, and that the convention composed of such legally elected delegates was the Democratic convention of the Democratic party of this state. These allegations pre-

sented issues of fact which, if true, were sufficient to consti-
tute a defense in this case, and justified the defendant in his
action in accepting the ticket nominated by the anti-Dubois
faction presided over by McClear. For these reasons, the
court was of the opinion that the answer stated facts suffi-
cient to constitute a defense, as against a general demurrer.

The next inquiry presented by the record in this case is:
How far, if at all, do the laws of this state apply to politi-
cal parties in the conduct of primaries, the selection of dele-
gates and the holding of conventions?

The legislature of this state in 1899 passed a law provid-
ing a complete scheme for holding and conducting elections.
Section 16 of this act provides: "Any convention or primary
meeting, as hereinafter defined, held for the purpose of mak-
ing nominations to public office, and also electors to the num-
ber hereinafter specified, may nominate candidates for pub-
lic office to be filled by election within the state. A conven-
tion or primary meeting, within the meaning of this act, is
an organized assemblage of electors or delegates representing
a political party or principle."

Section 17 of the same act provides for certifying nomina-
tions so made to the proper officers.

Section 19 of the same act provides that "Candidates for
public office may be nominated, otherwise than by convention
or primary," by petition. The law then further provides
for the preparation and arrangement of ballots and the con-
duct of elections.

It will thus be seen by this act that the legislature has
recognized political parties and political conventions as fac-
tors in the general scheme for nominating candidates for of-
fice, and conducting elections generally.

In 1903 (Laws of 1903, p. 360), the legislature of this
state enacted a primary election law, supplementing the gen-
eral election law, and provided for holding party primaries
and the election of party delegates to conventions. Section
1 of the act of 1903 provides that:

"A primary election within the meaning of this act is an
election held in any county, city, town or precinct in the

state of Idaho by any political party, for the purpose of electing delegates to political conventions, and the provisions hereof shall apply only to general state and county and general city or town elections.''

This section clearly indicates the intention of the legislature to provide party primary elections at which delegates shall be selected to political conventions. The political conventions contemplated evidently were the political conventions designated and recognized by the general election laws of 1899.

Section 2 of the act of 1903 provides and makes it the duty of the duly authorized committee of a political party to give notice of the holding of such primary elections.

Section 3 of said act provides that such primary election must be held in each voting precinct in the county, city or town on the same Monday afternoon, specifying the hours. Then follows the method of conducting such primary elections.

Section 6 provides that only regularly qualified voters who are entitled to vote at such primary elections are permitted to vote thereat or take any part therein, and it is unlawful for any person who was not affiliated at the last general election, or for any person who has not resided for at least thirty days in the election precinct where the primary election is held, to vote or take part in such primary election; provided, that one who has since the last election become of age may vote if otherwise qualified.

Section 9 provides that, ''In case any delegate elected to a convention fails to appear and serve, he shall not give his proxy to anyone, but the vote of such delegate must be cast by the balance of the delegation from the precinct, and if no delegate appears from the precinct, such precinct must be without any representation.''

Section 10 provides: ''When at any primary election such irregularities or frauds on the part of the voters or of the officers of election or of any other persons shall occur, resulting in the election of delegates, which the convention to which they are elected is clearly satisfied would not have

been elected had the primary been fairly and honestly conducted, the convention must deny any delegate, so fraudulently elected, a seat in the convention.''

Section 11 provides: ''The application of this act to any political party which at the last general election cast less than ten per cent of the whole number of votes cast, is optional with such party. This act does not prevent any political party from providing and directing that the delegates elected under the provisions of this act to the county convention may select delegates to the state convention.''

It will thus be seen by this act that the legislature recognizes political parties and political conventions for the purpose of nominating candidates for office. A complete scheme is provided for holding primaries and the election of delegates. Counsel for plaintiff contends that this law is directory merely, and that a political party or organization may select delegates to county conventions in any manner they may adopt other than that provided by law, and that it is optional with such party whether primaries be held under this law, or no primaries held at all. Section 1 of the act clearly provides that a primary election is an election held in any county, etc., by any political party, for the purpose of electing delegates to political conventions; that is, any election held by a political party for the purpose of electing delegates to political conventions is a primary election, and section 11 provides that the application of the act to any political party which at the last general election cast less than ten per cent of the whole number of votes is optional with such party. If the application of the act is only optional with a party casting less than ten per cent of the whole number of votes cast at the last general election, it certainly is not optional with parties casting more than ten per cent, and if not optional, it must be mandatory that a primary election held by such party shall be held under the provisions of this act. The principle of construction *expressio unius est exclusio alterius*, applies.

This act further provides for the qualification of voters at such primary election, the rights of delegates elected thereat,

attending a convention when all are not present, the effect on the representation of a precinct failing to elect delegates at such primaries, and the duty of the convention to which delegates have been irregularly or fraudulently elected. With these provisions of the statute so clearly defined, the intent of the legislature would appear to be manifest, and it will not be presumed that the legislature would attempt to regulate and prescribe the method and manner of holding party primaries, the qualification of voters thereat, and the denial of the right of representation to any precinct when not represented by delegates so elected, and the duty of the convention to which delegates have been irregularly or fraudulently elected, without intending thereby to bestow upon all parties qualified and participating in such primaries protection under the law. The same motive which prompted the legislature in 1899 to protect the citizen in the exercise of the elective franchise from fraud, deception, compulsion and intimidation, and secure such rights at a general election, no doubt prompted the legislature in 1903 to pass the primary election law, now under consideration, for the protection of the citizen in his rights as a member of a party organization, and guarantee him the right to express, through his ballot, his wish as to the conduct of the affairs of his own party, and his preference in the selection of representatives to name the candidates for office within his party, and frame and promulgate party principles, free from trepidation or inducement, and without being asked or forced to surrender such right or suffer or permit the same to be bartered away. If this were not so, the statute would be nugatory, and an elector participating in such primaries would be powerless and without any method or means of protecting the right conferred upon him by such law. If this view be correct, then it must be conceded that the doctrine that political rights are beyond the domain of judicial investigation and determination, has been swept away by positive legislation upon the subject, and that it was the intention of the legislature that every right conferred upon the voter at a primary election would be protected, defended and enforced by appropriate

legal methods, and every wrong committed against such law would have its remedy.

It is true that the courts generally in the absence of a statute regulating such matters, have inclined to the holding that a judicial inquiry, as to the legality of party conventions and primaries, and the rights of persons to participate therein, would not extend beyond the inquiry of which contending party or faction had behind it the political organization to which it belonged. In other words, when the party organization recognizes the right of persons or delegates to a seat in a convention or to participate in the deliberations of a convention, the courts would not make any further inquiry except to ascertain what that decision was, and this, we understand, is the contention made by plaintiff, and to support which we are cited to *Williams v. Lewis,* 6 Ida. 184, 54 Pac. 619; *Addle v. Davenport,* 7 Ida. 282, 62 Pac. 681; *In re Pollard,* 25 N. Y. Supp. 385; *In re Redmond,* 5 Misc. Rep. 369, 25 N. Y. Supp. 381; *State ex rel. Mitchell v. Larson,* 13 N. D. 420, 101 N. W. 315; *State v. Lavik,* 9 N. D. 461, 83 N. W. 914; *State v. Porter,* 11 N. D. 309, 91 N. W. 944; *State v. Liudahl,* 11 N. D. 320, 91 N. W. 950; *State v. Board of Election Commrs.,* 167 Ind. 276, 78 N. E. 1016; *Matter of Fairchild,* 151 N. Y. 359, 45 N. E. 943; *State v. Weston,* 27 Mont. 185, 70 Pac. 519. But we believe we are safe in saying that all of the courts recognize the power and jurisdiction of the court to inquire into the legality of conventions and the authority and rights of delegates to participate therein, to the extent of ascertaining the application of the law thereto. In other words, in determining such matters, the court will follow the law and go as far as the law goes, and if the legal rights of a contending delegate are invaded or denied by a party committee or convention, the court will extend its inquiry to the extent of determining what legal rights of the individual have been so invaded or denied, as a basis for prescribing and enforcing a remedy.

The authorities relied upon by counsel for plaintiff, some of which are cited above, as we read them, do not hold to the contrary. An examination of these authorities clearly dem-

onstrates that the courts were dealing with questions of a purely political nature, and passing upon rights of committees and conventions with reference to matters which had not been covered or regulated by legislation. In the two Idaho cases cited, *Williams v. Lewis,* 6 Ida. 184, 54 Pac. 619, and *Addle v. Davenport,* 7 Ida. 282, 62 Pac. 681, this court was dealing with purely political questions which the legislature of this state had not at that time deemed it necessary to regulate by law, and these cases announce the general doctrine, that in the absence of legislation upon matters in relation to the conduct of conventions, primary elections, and the actions of committees with reference thereto, the court will not extend its inquiry, in determining the legality of contesting factions, beyond the ascertainment of which faction is indorsed, recognized and approved by the paramount authority within the party limits. But where the legislature of a state has regulated the method and manner of holding primary elections, the selection of delegates, the conduct and duty of conventions, the court will go beyond the inquiry as to the acts of the party authorities with reference to such matters, and inquire whether or not the legal rights of the citizen participating in such matters have been infringed upon or denied by such party authorities or conventions.

A few of the authorities discussing and dealing with this question directly are cited below: *State v. Houser,* 122 Wis. 534, 100 N. W. 964; *State v. Metcalf,* 18 S. D. 393, 100 N. W. 923, 67 L. R. A. 331; *Ladd v. Holmes,* 40 Or. 167, 91 Am. St. Rep. 457, 66 Pac. 714; *Neal v. Young,* 25 Ky. Law Rep. 183, 75 S. W. 1082; *State v. Hogan,* 24 Mont. 383, 62 Pac. 583; *State v. Martin,* 24 Mont. 403, 62 Pac. 588; *Brown v. Cole,* 105 N. Y. Supp. 196; *Spencer v. Maloney,* 28 Colo. 38, 62 Pac. 850; *Whipple v. Broad,* 25 Colo. 407, 55 Pac. 172; *In re Woodworth,* 16 N. Y. Supp. 147, 19 N. Y. Supp. 525, 46 N. Y. St. Rep. 432; 15 Cyc. 332; *In re Fairchild,* 151 N. Y. 359, 45 N. E. 943.

In the case of *State v. Metcalf, supra,* in discussing the question, the court says:

"Whenever the legislature in its wisdom sees fit to regulate nominations and the printing of ballots by statutory enactments, the duty of interpreting such enactments devolves upon the courts, and they should not attempt to escape responsibility or avoid disagreeable consequences by assuming that no judicial questions are involved. The auditor's duties and the candidate's rights respecting the preparation of ballots, having been defined by statute in this state, the performance of such duties and the protection of such rights no longer present merely political questions but must be dealt with as are other legal duties and other legal rights. So we are compelled to conclude that it is a duty of this court in this proceeding to determine which, if either, of these sets of candidates is entitled to be recognized as representing the Republican party in Roberts county."

In *State v. Houser, supra,* in discussing this question, the court says:

"Enough has been said to demonstrate that in full harmony with the law, that within jurisdictional limits, the decision of the highest tribunal of a voluntary organization as to any of its internal controversies is binding on the courts, and in full harmony with the logically resulting doctrine that political party disputes, in the absence of legislation, should be left solely to the highest party authority, indicated by the nature of the organization itself, for settlement, or, at least, if settlement was so made, it should be deemed binding on the court, section 35 and all similar laws had their origin."

In *Neal v. Young, supra,* the court of appeals of Kentucky, in discussing this question, says:

"Since the adoption of the official ballot system by the constitutional convention, since the legislative branch of the state government provided for the regulation of primary elections by law, questions involving the legal rights of individuals will arise for the determination of the courts. The necessity for such adjudications has been placed upon the courts by the changes which have been made by the organic and statutory law of the state. However much the courts desired to do so, they could not avoid the responsibility of

deciding such questions, even if perchance some one should fail to discriminate between political rights and those legal rights which arise under the law, and declare the court was adjudicating purely political questions.''

The supreme court of Montana in *State v. Hogan, supra,* after discussing the finality of the decision of the party authorities with reference to the regularity and legality of a mass meeting in choosing delegates, says:

''To what limit courts should go in holding that party disputes should be settled in the judicatories of the party, and be left undisturbed, is a question which does not properly arise in this case. The question here already considered and decided arises upon the force and meaning of a part of the election law, and involves an inquiry as to whether the requirements of the law have been complied with, so as to render the nomination in question a valid one. To permit a political convention to determine such a question would be to say that political bodies possessed judicial power, and may oust the courts of jurisdiction in matters which should fall within their cognizance. The statement of this proposition is its own refutation. So far as we are aware, no court has ever assented to this doctrine.''

These cases, we think, recognize the doctrine adhered to by all the courts dealing with this subject, and that is, that party conventions, committees or the party authority, cannot decide or determine a matter which is regulated by law, and thereby abrogate the law or oust the courts of jurisdiction to hear and determine such matter, and that the courts will deal with such question as any other legal controversy, uninfluenced by any action or decision such party authority may make in the matter.

The legislature, then, having enacted a primary election law providing for holding and conducting primary elections and prescribing the qualification of voters thereat, thereby confers upon every member of the party holding such primary, a legal right—the right to have his vote counted as cast; the right to have the persons receiving the majority of votes cast at such primary, represent such majority in the conven-

tion to which they have been elected; the right to a voice in the convention expressed through the delegates so elected; the right to have printed upon the official ballot the names of the nominees of a convention composed of legally elected delegates. The delegate thus elected has the legal right to represent his party in all conventions to which he may be elected, and to speak for his party upon all matters affecting its policy and nominations. Such right is a legal right, growing out of the law itself, and no committee or convention can deprive such persons of such right conferred by law, and the courts are open to all such persons to which they may apply for the enforcement of such legal remedies as will protect them in such legal rights.

In discussing this question, the supreme court of Illinois in *People v. Board of Election Commrs. of Chicago*, 221 Ill. 9, 77 N. E. 321, says:

"The right to choose candidates for public offices, whose names will be placed on the official ballot, is as valuable as the right to vote for them after they are chosen, and is of precisely the same nature. There is scarcely a possibility that any person will or can be elected to office under this system unless he shall be chosen at a primary election, and this statute which provides the methods by which that shall be done and prescribes and limits the right of voters and of parties, must be regarded as an integral part of the process of choosing public officers, and as an election law."

The supreme court of New York in *Brown v. Cole, supra,* well says:

"There no longer remains any distinction, so far as enforcement is concerned, between civil and political rights of citizens; but it will be presumed that every right recognized or conferred by statute may be enforced by proper legal method, and that every wrong, whether civil or political, has its remedy."

The same court in the same case, 105 N. Y. Supp. 196, says:

"Every voter has the right to vote at the primaries of his party, and he cannot be deprived of this right, but will be protected in it by the courts."

We then hold that the primary election law enacted in 1903 (Laws 1903, p. 360) is mandatory, and applies to and governs all political parties not therein specifically excepted. This law provides two methods of electing delegates to a state convention: 1st, by a direct vote at such primaries for such delegates; 2d, by a convention composed of delegates elected at a primary held under the law. The law, then, providing for the election of delegates at a primary election, it necessarily follows that delegates so elected have a legal right to sit and act in the convention to which they are elected, in preference to delegates not so elected. This being a legal right, a committee or convention has no power or authority to take away the same or deny such right to such delegates.

This leads us to a consideration of the power and authority of the state central committee in making up the roll of delegates to participate in the temporary organization.

The Democratic state central committee met on August 3, 1908, prior to the opening of the convention, and made up a temporary roll of the delegates which it considered entitled to seats in the convention during the temporary organization, and it is contended on the part of the defendant that such committee had no power or authority to prepare such temporary roll of delegates, and that it was for the convention to decide who were entitled to seats and to participate in the temporary organization. Preliminary to this matter, however, it is charged in the answer that after the organization of the state central committee in 1906, and the appointment of H. W. Lockhart as chairman, that he appointed certain members of such committee without authority. There is no statute upon this subject, and in the absence of a showing to the contrary, the court will presume that the appointments were made in accordance with the general authority of the chairman. This question, however, is not material, as the action of the state central committee in making up the temporary roll does not seem to have been controlled by the vote or acts of the parties so appointed, and for that reason, the court is of the opinion that a further consideration of this question is unnecessary. The laws of this state do not in

any way fix or regulate the powers or duties of a party state central committee, and in the absence of a statute governing the same, the court will presume that the action of the committee in making up a temporary roll of delegates was the result of its own decision to do so, and it so deciding, its authority will be presumed in the absence of anything to the contrary, until the convention decides otherwise. In making up such roll, however, the committee had no power or authority to reject or deny legally elected delegates a place thereon, and in lieu thereof recognize and place on such roll delegates not elected according to law, and if it did so, its action is subject to review in this court upon proper application in a matter involving the action of such delegates so placed on such roll.

It certainly will be conceded that some person, body or authority must, in the first instance, determine who are entitled to seats in the convention, and to participate in the deliberations thereof, and where a party state central committee has been elected to represent the party during the interim between conventions, and in arranging for a convention of the party, decides that it will prepare a temporary roll of delegates in the first instance, it has authority to do so. The state central committee, then, having power and authority to make up a temporary roll of delegates to participate in the temporary organization, could only place upon such roll such delegates as had been elected to such convention in accordance with the laws of this state, and the fact that delegates were placed upon such roll, who had not been elected in accordance with law, did not give to such delegates any legal right to participate in the temporary organization of the convention. In other words, only delegates elected in accordance with law could be placed upon such roll and participate in the temporary organization of such convention.

This same rule applies to the convention, as neither the committee nor the convention is superior to the law, nor can the committee or convention make rules and regulations in violation of the law, or confer rights or privileges upon dele-

gates not elected according to law, or deny such rights or privileges to delegates elected in accordance with law. By this statement, however, we do not intend to hold that a convention may not seat and recognize as delegates and members thereof any persons such convention may decide to admit, and permit such persons to participate in the business of such convention, in the absence of any other persons claiming to be the legal delegates or members, or in the absence of a claim by one denied a legal right by reason of such action. The question in this case, and which we are now discussing and deciding, is the right to sit and participate in a convention of a person elected according to law, as against the right of a person not elected in accordance with law.

This now brings us to a consideration of the facts involved in this controversy.

The following facts are agreed to by the respective parties: That at the regular Democratic state convention of the Democratic party, held at Coeur d'Alene City on August 6, 1906, a state central committee was regularly elected to act during the ensuing two years, and until its successor should be chosen, and that such committee, organized by the election of H. W. Lockhart, one of its members, as chairman, and C. E. Arney, as secretary; that said state central committee was the representative of the Democratic party during the interim between the convention held in August, 1906, and the convening of the convention in 1908, and had power as such to select a time and place for holding the Democratic state convention for the nomination of presidential electors, a member of Congress, and candidates for the various state offices, to be voted on at the general election to be held on November 3, 1908; that said state central committee convened on February 27, 1908, and fixed the time and place for holding said state convention, and issued a call therefor, calling said convention to meet in the city of Wallace, the county of Shoshone, on August 4, 1908; that said convention convened in accordance with the call of the state central committee, at 3 P. M., on August 4, 1908, and was called to order by H. W. Lockhart, as chairman, and there being no quorum pres-

ent, a recess was taken until 10 o'clock A. M., on August 5, 1908; that the state central committee at its session on February 27, 1908, apportioned the representation in the state convention to be held on August 4, 1908, among the various counties of said state, as follows:

| | | |
|---|---|---|
| Ada county | 31 | delegates |
| Bannock county | 14 | " |
| Bear Lake county | 2 | " |
| Bingham county | 14 | " |
| Blaine county | 11 | " |
| Boise county | 10 | " |
| Bonner county | 14 | " |
| Canyon county | 28 | " |
| Cassia county | 3 | " |
| Custer county | 7 | " |
| Elmore county | 8 | " |
| Fremont county | 12 | " |
| Idaho county | 18 | " |
| Kootenai county | 15 | " |
| Latah county | 13 | " |
| Lemhi county | 8 | " |
| Lincoln county | 8 | " |
| Nez Perce county | 21 | " |
| Oneida county | 4 | " |
| Owyhee county | 7 | " |
| Shoshone county | 22 | " |
| Twin Falls county | 9 | " |
| Washington county | 19 | " |

That the counties of Ada, Bannock, Blaine, Boise, Canyon, Cassia, Custer, Elmore, Idaho, Kootenai, Latah, Lemhi, Lincoln, Nez Perce, Owyhee, Shoshone, Twin Falls and Washington, held regular primaries in said counties, in accordance with law, and thereat elected delegates to county conventions, which thereafter regularly elected delegates to the state convention; that primaries were regularly held in the county of Bonner on a Saturday instead of Monday, the day fixed by law, at which delegates were elected to the

county convention which elected the delegates apportioned to said county to said state convention.

The controversy arises as to the regularity of the delegates selected to said state convention from the counties of Fremont, Bingham, Bear Lake and Oneida, the legality of the convention of Bonner county, and the contested delegation from Ada County.

As to Bonner county: It is stipulated that primaries were regularly called and held on Saturday instead of Monday, and that no other primaries were held in said county; that the delegates so elected at such primary held on Saturday met in convention and elected delegates to the state convention, which delegates were also afterward appointed by the county central committee, and that these delegates so elected to the state convention were recognized by the committee on credentials as the legal delegates from Bonner county, and acted with the Dubois faction in the convention presided over by McKinley.

Under this stipulation, Bonner county had no legal delegates in the state convention. The primary election law is mandatory, and must be substantially complied with. To hold primaries on some other day than that fixed by law, in effect substitutes the action of the party or its central committee for the law itself, and renders the same nugatory. If the party authorities can evade the law as to the day upon which the law requires the primaries to be held, it would seem that they could evade the law in any other substantial particular. Certainly the day on which the primaries are required by law to be held is important. The members of the party have a right to rely upon the law and to believe that primaries will be held in accordance with law and upon the day fixed by law, and the party authorities have no right to set aside the provisions of the law and hold primaries on a day not fixed by law; neither can the county central committee appoint delegates, because that is not the manner in which the law requires such delegates to be selected. If this can be done, then the party authorities may substitute rules and regulations for the law, and the law becomes of

no effect. We therefore hold that Bonner county had no legally elected delegates in the state convention, and had no right or authority to participate in said Democratic state convention. Deducting, therefore, the fourteen delegates apportioned to Bonner county from the total apportionment leaves the convention to consist of 284 delegates, a majority of which is 143.

It may be argued, however, that inasmuch as there was no contesting delegation from Bonner county, and no one claiming the right to participate in said convention as against the delegates elected at said county convention, that such delegates should be recognized and considered as legal delegates to the convention. This argument might have some force if it were not for the fact that this court is now called upon to determine the question as to whether or not the ticket nominated by the convention in which the Bonner county delegates were admitted and participated is the Democratic ticket, or whether the ticket nominated by the convention in which said Bonner county delegates did not participate is the Democratic ticket. True, in this instance the legality of the Bonner county delegates can make no difference for the reason that even admitting that said delegates so elected were legal, it would not change the result or give the Dubois faction a majority of the legally elected delegates. Inasmuch, however, as the court is called upon to determine which was the Democratic convention, and this depends upon which convention had a majority of the legally elected delegates, we have not evaded the responsibility upon the grounds above suggested.

As to Fremont county: The parties stipulate that at the regular Democratic county convention, held in Fremont county in the summer of 1906, to which delegates were regularly elected for the purpose of electing delegates to the Democratic state convention, to be held at Coeur d'Alene City, Idaho, on August 6, 1906, certain differences arose among the delegates, which resulted in the formation of two factions of the Democratic party in said county, designated as Dubois and anti-Dubois, both of which were represented

in said state convention held August 6, 1906; that the delegates to said state convention, representing the anti-Dubois faction (which afterward participated in the Wallace convention on August 4, 1908, presided over by McClear), were elected at such county convention, and the delegates representing the Dubois faction (which afterward participated in the convention held at Wallace on August 4, 1908, presided over by McKinley), were elected at a mass meeting called for that purpose; that the delegates so chosen by the anti-Dubois faction were denied seats in said state convention on August 6, 1906, and the delegates so elected by the Dubois faction were admitted to seats and participated in said state convention; that after such state convention in 1906, a Democratic county convention was regularly called, composed of delegates elected at primaries, according to law; that such convention was in sympathy with the anti-Dubois faction, which was denied seats in said Democratic state convention; that said county convention convened and adopted resolutions, elected a chairman and secretary and members of the county central committee for the ensuing two years, and thereafter adjourned; that after such adjournment, a large number of the delegates, together with Republicans, met in a mass meeting and made nominations for county offices; that two delegations, one representing each of said factions, attended a Democratic state convention held at Twin Falls in June, 1908, for the purpose of electing delegates to the Democratic national convention, and that at such Democratic convention the delegates representing the Dubois faction were seated, and the delegates representing the anti-Dubois faction were denied seats; that at Twin Falls the two factions of the Democratic party in the state of Idaho, held state conventions, both of which elected delegates to the Democratic national convention to be held in Denver in July, 1908; that the delegates to said Democratic national convention elected by the Dubois convention were given seats and recognized as the legal delegates in said Democratic national convention, and the delegates elected by the anti-Dubois convention were denied seats; that after the Twin Falls convention, one M.

J. Walter, who was a delegate of the Dubois faction from said Fremont county to the Twin Falls convention, who had, prior to said time, been appointed by the chairman of the Democratic state central committee as state committeeman for Fremont county, called a mass meeting for the purpose of organizing a Democratic party in said Fremont county; that notices were printed and sent out, and about thirty persons attended said mass meeting; that at such mass meeting, one James Galbraith was appointed chairman of the Democratic county committee and J. G. Gwinn, secretary; that such persons issued a call for primaries to be held in Fremont county on July 28, 1908, for the purpose of electing delegates to the county convention, at which delegates would be selected to the state convention to be convened at Wallace on August 4, 1908; that notices calling such primaries were published and posted as required by law; that such county convention elected delegates to the state convention at Wallace, which were recognized and seated in the Democratic convention presided over by McKinley; that a few days after holding the Democratic county convention in 1906, which adjourned without nominating a county ticket, petitions were circulated for the purpose of nominating by petition a county ticket known as the American party county ticket, which was placed on the official ballot and voted for at the general election held in 1906.

The stipulation then contains certain resolutions and a list of candidates upon the American party ticket, which to the court are of no consequence and are immaterial, so far as this case is concerned.

The stipulation then further admits that on July 1, 1908, the Democratic county central committee elected by the Democratic county convention, held in 1906, which organized by electing a chairman and secretary, but which made no nominations, met and authorized its chairman and secretary to issue a call for primaries to a county convention for the purpose of electing delegates to the state convention to be held at Wallace, on August 4, 1908; that such primaries were held on July 27, 1908, in accordance with the primary elec-

tion law of this state, at which twelve delegates were elected to the state convention to be held at Wallace on August 4, 1908, which delegates were denied seats in the Dubois convention presided over by McKinley, and were admitted to seats in the anti-Dubois convention presided over by McClear, both held at Wallace on August 4, 1908.

Under this stipulation it appears that the Democratic party of said Fremont county met in a county convention in 1906, and organized by the election of a chairman and secretary, and thereafter adjourned without nominating a county ticket. Because this convention was not in harmony with the platform as adopted by the state convention, and made no county nominations, is given as the reason why M. J. Walter and others thereafter attempted to organize a Democratic party in said Fremont county, and by reason of their acts, it is claimed that the organization so made constitutes the legal Democratic authority in said county, and supersedes and takes the place of the Democratic county central committee selected at the county convention in 1906. There is no law which imposes any duty upon a county convention as to nominating candidates for county offices, and there is no law which imposes upon a county convention any duty as to adopting or favoring all of the policies adopted by the state convention. In the absence of any statute upon this subject, the county convention held in 1906, being the Democratic convention legally held, had authority to adjourn without nominating any county ticket, and the failure to nominate a county ticket or to adopt resolutions supporting the platform of the state convention, or the fact that the county convention was not in all matters in sympathy with the policy or acts of the state convention, would not dissolve the Democratic county organization or terminate its existence. This fact alone would not authorize persons claiming to be in sympathy with the Democratic state platform to gather themselves together and organize a Democratic party in said county, and thereby succeed the regular organization of said party. The affairs of the Democratic party in the interim between one convention and another were in the hands of

the Democratic county central committee, and it could not be supplanted by another Democratic county central committee composed of persons who were not in sympathy with or who did not indorse the acts of the convention appointing such committee, or the course or acts of such committees. The Democratic county central committee selected at the Democratic county convention in 1906, continued to be the Democratic county central committee until it ceased to act, its authority was revoked, or it was dissolved by some superior authority. This does not appear to have been done. This committee met on July 1, 1908, and authorized the holding of primaries to elect delegates to the county convention which, in turn, was to elect delegates to the state convention. These delegates selected were seated in the anti-Dubois convention at Wallace, presided over by McClear, and were denied seats in the convention presided over by McKinley. The convention which elected the delegates to the Dubois convention was composed of delegates elected at primaries held on Tuesday, July 28, 1908. These primaries were regularly held on this particular day. There, however, could be but one legal convention for the same purpose. The county convention called on July 1, 1908, was called by the regular Democratic county central committee of said county, and was held in accordance with law, and as only one legal convention could be held in said county for the same purpose, it follows that the convention held in said county, composed of delegates elected at primaries held on July 28th, was not a legal convention. There is another reason why the delegates elected by the latter convention were not legal delegates, and that arises out of the fact that the primaries at which the delegates to such convention were elected, were held upon a day not fixed by law, to wit, Tuesday, July 28, 1908, and the rule announced as to the Bonner county delegates applies, and such delegates for that reason were not legal delegates and were not entitled to seats in said convention. The delegates elected at the county convention and recognized and seated by the anti-Dubois faction presided over by McClear were the legal delegates from said county, and neither the said committee,

the Democratic National Convention, nor the state convention, had any authority in law to seat or make valid delegates elected by the Dubois faction contrary to law.

As to Bingham county: The facts as to Bingham county are presented in the record, partly by stipulation and partly by evidence. It is stipulated that in 1906 primaries were regularly called, according to law, to select delegates to a Democratic county nominating convention; that this convention was regularly held on October 1, 1906, and was controlled by a majority who were not in harmony with the state platform adopted that year; that seven of the delegates composing said convention who were in harmony with the Democratic state platform, withdrew from said county convention, and on the same day associated themselves with others in a public meeting and organized an American party, and thereafter nominated a county ticket, which was placed upon the official ballot to be voted for at the general election that year under the name of the American party ticket; that after withdrawal of said seven delegates from said county convention, said convention proceeded regularly with its business, nominated a county ticket and elected a county central committee to serve for the ensuing two years, from sixteen precincts in said county, out of a total of thirty precincts; that thereafter said county central committee organized and elected one W. A. Beakley as chairman and J. T. Carruth as secretary; that on April 24, 1908, a call purporting to be the call of said county central committee was issued, signed by W. A. Beakley as chairman, and George Chapin, as secretary pro tem., for primaries to be held in said Bingham county, on the 18th day of May, for the purpose of electing delegates to a county convention to elect delegates to the state convention to be held at Twin Falls, for the purpose of electing delegates to the national convention, and to the state convention at Wallace, for the purpose of nominating candidates for state offices; that notices of such primaries were duly posted and published as provided by law, and primaries held and delegates elected to said county convention from the different precincts; that said convention met and consisted

of fifty-five persons, the total number entitled to representation having been fixed at seventy-six; that at said convention, fourteen delegates were elected to the Democratic state convention to be held at Twin Falls on June 4th, and were given seats in said convention and participated in the Dubois convention presided over by McKinley; that on the same day that the county convention was held, to wit, May 22, 1908, there was also held in Blackfoot a mass convention attended by twenty delegates representing the anti-Dubois faction; that the delegates attending such mass convention were elected at caucuses held in the various precincts of said county pursuant to a call purporting to be issued and signed by H. C. C. Rich as chairman, and H. L. Hansen as secretary pro tem, under the direction of ten members of the said county committee; this mass convention selected fourteen delegates to attend the Democratic state convention to be held at Twin Falls on June 4, 1908; no primaries were called, but notice of the caucuses was published; that both sets of delegates elected to the Twin Falls convention attended, and the delegates elected by the county convention held at Idaho Falls on May 22, 1908, were given seats and participated in the proceedings of the Dubois Democratic convention, presided over by McKinley, and the delegates elected by the mass convention were given seats in the anti-Dubois convention, presided over by Judge Perky, and were denied seats in the other convention; that the national Democratic convention held at Denver in July, 1908, after a hearing, admitted and recognized the delegates from the Dubois state convention at Twin Falls, presided over by McKinley; that the Democratic convention held at Idaho Falls on May 22, 1908, also elected fourteen delegates to attend the Democratic state convention to be held at Wallace on August 4th, who were given seats and admitted into the Dubois convention presided over by McKinley; that in June a call purporting to be the call of the county central committee was issued and signed by H. C. C. Rich as chairman, and J. T. Carruth as secretary, for primaries to be held in said Bingham county on the 20th of July, for the purpose of electing

delegates to the county convention to be held in said county on July 27th, to elect delegates to the state convention to be held at Wallace; that notices were given as required by law and said primaries held in accordance with law; that the delegates elected at such primaries held a convention composed of nine delegates and elected fourteen delegates to attend the Wallace convention; that such county convention represented the faction of the Democratic party whose convention at Twin Falls was presided over by Judge K. I. Perky, and also the faction of the Democratic party whose convention at Wallace was presided over by McClear, and that such delegates were denied seats in the Dubois convention at Wallace presided over by McKinley, but did participate in the anti-Dubois convention presided over by McClear.

The point upon which counsel were unable to stipulate and upon which evidence was introduced relates solely to the question as to whether or not the call made on April 24, 1908, signed by W. A. Beakley, as chairman, and George Chapin, as secretary pro tem., for primaries to be held on May 18, 1908, was the call of the Democratic county central committee. The evidence upon this point is conflicting, but it must be conceded that upon said date, W. A. Beakley was chairman of the Democratic county central committee, and it is admitted that the notices he issued for primaries were in accordance with the laws of this state, and that primaries were held at which delegates were elected to the county convention, and that the county convention met and no one made objection to the legality of the convention or to any of the delegates attending such convention. No complaint is shown that any member of the Democratic party was misled or denied any right to participate at such primaries, or that any person intending to affiliate with such party was denied that right. It appearing that the call was made by one who was the chairman at the date the call was made, and that the call was in accordance with law, and that the members of the party intended to be affected by such call participated in such primaries, and that no one was denied any right by reason of such call, the court will presume that the chairman

had such authority and that the call was authorized, especially in view of the conflict in the evidence as to such authority.

Following the rule announced as to Fremont county, the delegates selected at the county convention held at Idaho Falls on May 22, 1908, and who participated in the Dubois convention at Wallace, presided over by McKinley, were the legal delegates and had the right to be recognized as such from said county of Bingham.

As to Bear Lake county: It is stipulated that at the time of the Democratic state convention held at Coeur d'Alene City in 1906, there arose in said county two factions; that a Democratic county convention for said county was duly and regularly held after primaries were held in accordance with the laws of this state; that such convention elected a county central committtee, after which it adjourned *sine die,* without placing in nomination any Democratic county ticket; that after the adjournment of said convention an independent ticket was nominated by petition in said county, and that a large majority of the persons who signed the petition represented that faction of the Democratic party which was refused seats in the Dubois Twin Falls convention, presided over by McKinley, and the Dubois Wallace convention presided over by McKinley; that the delegates to the anti-Dubois Twin Falls convention elected in 1908 were elected at a mass meeting, and that the delegates of the Dubois faction of the Democratic party of said county who were seated in the Dubois conventions at Twin Falls and at Wallace, were appointed as such delegates by one Joseph McCart, state central committeeman for said county, who had been appointed by H. W. Lockhart, chairman of the said state central committee, which said appointment was ratified by the state central committee on February 27, 1908; that at the Twin Falls convention there were two factions of the Democratic party which held conventions, both of which elected delegates to the Democratic National Convention to be held in Denver, and that the delegates elected by the Dubois faction, presided over by McKinley, were given seats, and the delegates

elected by the anti-Dubois faction were denied seats after both factions had been heard by the committee on credentials; that after the Twin Falls convention, a Democratic county convention was regularly had and held in said Bear Lake county, after primaries had been held in accordance with the laws of this state, pursuant to a call of the Democratic county central committee elected by the Democratic county convention held in 1906, and that delegates were elected to represent said Bear Lake county in the Wallace convention, which delegates were denied seats by the Dubois faction presided over by McKinley, but participated in the anti-Dubois convention presided over by McClear; that the delegates so participating in the anti-Dubois convention represented that faction of the Democratic party in Bear Lake county which refused to lend its aid or assistance to the Democratic state campaign in 1906, because of differences upon the Mormon question.

From this stipulation it appears that there was a regular Democratic organization in the county of Bear Lake in 1906; that a county convention was held; that a central committee was elected, and it further appears that this central committee regularly issued a call for primaries, and that such primaries were regularly and legally held in said county for the purpose of electing delegates to a county convention to elect delegates to the state convention to be held at Wallace, August 4, 1908; and that such delegates so elected were denied seats in the Dubois convention presided over by McKinley, but were admitted and participated in the anti-Dubois convention presided over by McClear.

For the reasons heretofore given, it appears that the delegates elected at the county convention in 1908, composed of delegates elected at primaries in accordance with law, constituted the regular Democratic convention called by the regular Democratic organization in said county, and that the delegates so elected were the only legal delegates elected from said county to said state convention. There was no authority of law which authorized the state central committeeman from said county to appoint delegates to the state convention.

As to Oneida county: It is stipulated that after the adjournment of the Democratic state convention held at Coeur d'Alene in 1906, a county convention was duly and regularly had and held in said county after a primary election regularly called and held according to law, and that said county convention met, and after the election of a county central committee to serve for the ensuing two years and the adoption of certain resolutions, said county convention adjourned without nominating a Democratic county ticket; that thereafter a convention was held in said county, composed of persons, some of whom were Democrats who had previously participated in the Democratic county convention, and some were Republicans and nominated an independent county ticket for said county, which was placed on the official ballot and voted for at the general election held that year; that by reason of the action of said convention in 1906 there arose two factions of the Democratic party in said county; that in the month of May, 1908, a mass meeting was called which elected four delegates to attend the Twin Falls convention, which delegates represented the faction which held the county convention in 1906, which delegates were denied seats in the Dubois convention presided over by McKinley, but were admitted to seats and participated in the convention presided over by Judge K. I. Perky; that at a mass meeting held in May, 1908, and called for that purpose, four delegates were elected to attend the Wallace convention, representing that faction of the Democratic party in said county which was in harmony with the Democratic platform adopted by the Democratic state convention in 1906, and which faction was given seats in the Dubois conventions at Twin Falls and Wallace. The stipulation then further provides that the delegates elected by the Dubois convention at Twin Falls were recognized by the national convention, etc. It is further stipulated that after the Twin Falls convention, a call was duly and regularly issued for primaries and a county convention to elect four delegates to the Wallace convention; that said call was issued by the Democratic county committee which had been elected at the county convention held in said county

in 1906, and in pursuance of said call, primaries were held according to law and a convention regularly held which elected four delegates to the Democratic state convention to be held at Wallace; that the four delegates so selected represented the faction in said county which was not in harmony with the platform of the Democratic state convention of 1906, and were denied seats in the Dubois Wallace convention presided over by McKinley and were given seats and participated in the anti-Dubois convention presided over by McClear.

From this stipulation it appears that the delegates participating in the anti-Dubois convention held at Wallace were the only delegates elected from said county as provided by law, and it further appears that such delegates were elected at a county convention, called by the then Democratic county central committee and composed of delegates elected at primaries held according to the laws of this state.

In this connection it may be stated that it is unnecessary, and it would be going beyond the issues as presented, for this court to determine which faction of the Democratic party in each of these counties has the control of the Democratic organization at the present time. For the purposes of this case, it is only necessary to inquire whether or not the Democratic authority as it existed at the time the respective delegations were selected, called the primaries which resulted in electing the delegates according to law and not what faction controls the party at the present time. What may have happened since is a matter of no consequence and in no way affects the result to be reached in this case.

As to Ada county: It is stipulated that a Democratic county convention was regularly had and held in said county in 1906, after primaries had been held in accordance with law, at which delegates were elected thereto and after election of a Democratic county central committee to serve for the ensuing two years, by said convention, the same adjourned without nominating a Democratic county ticket, and that said Democratic convention was controlled by the Dubois faction of the Democratic party as represented by the conventions

at Twin Falls and Wallace, held in 1908, and presided over by McKinley; that after the adjournment of said county convention, an independent county ticket was nominated by petition; that said petition was signed by a number of delegates who participated in said county convention, representing the faction of the party in control of said convention, also by certain Republicans, and that such independent ticket was placed upon the official ballot and voted for at the general election in 1906; that in 1908, and prior to the Democratic convention held at Twin Falls, a Democratic county convention was regularly had and held, to which delegates had been elected at primaries held in accordance with law and pursuant to the call of the Democratic county central committee, elected at said Democratic county convention in 1906; that such county convention held in 1908, elected thirty-one delegates to represent said Ada county in the Twin Falls and Wallace conventions; that thereafter in July, one J. M. Woodburn, chairman of the Democratic county central committee, elected in 1906, at the request in writing of about twenty-four Democrats, appointed a delegation of thirty-one persons to represent said county at said Wallace convention, and that he took such action without authority of the county central committee; that of said delegates elected by said county convention, eight were elected to attend the Wallace convention who were not elected as delegates to the Twin Falls convention; that neither of the delegations to said Wallace convention from said Ada county were permitted to participate in the preliminary organization of the convention presided over by McKinley, nor did said county have any representation whatever on any of the committees appointed by said Dubois convention presided over by McKinley; that the delegation from said county elected by said county convention participated in the anti-Dubois convention at Wallace, presided over by McClear; that the delegation elected at said county convention held in Ada county, to the Twin Falls convention, participated in the anti-Dubois convention at Twin Falls, presided over by Judge Perky, and that the Democratic National Convention at Denver refused to seat or recognize

the delegates elected at the Twin Falls convention presided over by said Judge Perky.

From this stipulation it clearly appears that there was but one set of delegates elected from Ada county to the Democratic state convention to be held at Wallace on August 4, 1908, which were elected according to law, and that was the delegates elected by the county convention after primaries held according to law. These were the legal delegates from said county, and had a legal right to participate in the temporary organization of said convention. The delegates selected by J. M. Woodburn were selected without authority of law, and were not legal delegates and had no right to sit or participate in either the temporary or permanent organization of said convention, and as shown by the stipulation of facts, were not permitted to so participate or sit.

It is further stipulated that the state central committee placed upon the temporary roll as delegates entitled to participate in the temporary organization of the convention, the admitted legally elected delegates from the counties of Bannock, Blaine, Boise, Canyon, Cassia, Custer, Elmore, Idaho, Kootenai, Latah, Lemhi, Lincoln, Nez Perce, Owyhee, Shoshone, Twin Falls and Washington, and in addition, the delegates elected by the county convention of Bonner county, and the delegates representing the Dubois faction from the counties of Fremont, Bingham, Bear Lake and Oneida. These delegates were permitted to participate in the temporary organization of the Dubois convention presided over by McKinley, and upon the report of the committee on credentials having been made to said convention in favor of seating said delegates, and also the Ada county delegates, the same delegates were permitted to vote upon said report, and the delegation from Ada county and the delegations chosen by the anti-Dubois faction in the counties of Fremont, Bear Lake and Oneida counties, were not permitted to vote upon said motion. By such action of the convention, it will be seen that the legal delegates from the counties of Ada, Fremont, Bear Lake and Oneida were denied the right to vote upon the report of the committee on credentials, while the illegally

elected delegates from the counties of Fremont, Bear Lake and Oneida were allowed and permitted to vote upon said motion, and in favor of seating such delegations.

It is further stipulated that after the adoption of the majority report of the committee on credentials, and prior to the adoption of the report of the committee on permanent organization and order of business, the following delegates withdrew from the Dubois convention presided over by McKinley, to wit: Blaine, 11; Boise, 10; Canyon, 28; Cassia, 3; Elmore, 8; Kootenai, 15; Lincoln, 3⅕; Nez Perce, 21; Owyhee, 7; total, 106⅕.

It thus appears that the Dubois convention, presided over by McKinley, after the withdrawal of the delegates above named, was composed of the following legally elected delegates: Bannock, 14; Bingham, 14; Custer, 7; Idaho, 18; Latah, 13; Lemhi, 8; Lincoln, 4⅘; Shoshone, 22; Twin Falls, 9; Washington, 19; total, 128⅘.

The 106⅕ delegates admitted to be legally elected, withdrawing from the Dubois convention, presided over by McKinley, united with the 31 legally elected delegates from Ada county, the 12 legal delegates from Fremont county, the two legal delegates from Bear Lake county, and the 4 legal delegates from Oneida county, making a total of 155⅕ legal delegates, organized the convention presided over by McClear as chairman. We thus see that after the withdrawal of the delegates, the Dubois convention was composed of 128⅘ legal delegates, and the anti-Dubois convention was composed of 155⅕ legal delegates.

It is argued by counsel for petitioner that by withdrawing from the Dubois convention, the delegates waived their right to participate in the same, and that their action could not affect the identity of such convention or deprive it of the right or power to proceed with the business before it, even though the delegates withdrawing constituted a majority of the delegates of said convention, and to support which our attention is directed to the cases of *State v. Lavik,* 9 N. D. 461, 83 N. W. 914; *Hutchinson v. Brown,* 122 Cal. 189, 54 Pac. 738; *State v. Porter,* 11 N. D. 309, 91 N. W. 950; and

*State v. Election Commrs.,* 167 Ind. 276, 78 N. E. 1019. These authorities support the rule that of assemblages regularly called, those who actually assemble constitute a quorum, and a majority of those voting, is competent to transact business. Those who do not attend are presumed to assent to the action of the majority who do attend and vote, and that by withdrawing from such convention, those so withdrawing merely waive their right to participate in the convention, and that their action in so doing does not affect the identity of the convention or deprive those who were present of the right to proceed with the business of the convention.

This principle is correct as applied to conventions or meetings of which the representatives therein are not required to be elected in accordance with a particular law of the state; but where the statute prescribes the method of electing delegates to participate in a convention, only those so elected are entitled to sit or participate, and the convention cannot convert a legal minority into a legal majority by permitting illegal delegates to vote with said legal minority. The Dubois convention could not convert a minority of the legal delegates into a majority, by permitting the illegal delegates from the counties of Fremont, Bear Lake and Oneida to vote with said legal minority; neither could such legal minority, acting with illegal delegates, constitute the legal minority the convention, or preserve the identity of the convention, or take away the power or authority of the majority of the legal delegates entitled to sit in said convention. The convention was composed of a certain number of legal delegates, and it was the legal delegates who had the power and authority to control such convention and determine its procedure, policies and acts, and if a minority of the legal delegates could associate with such legal delegates a sufficient number of illegal delegates to make a majority over the legal delegates, then the purposes and objects of the primary election law of this state would be defeated. If this could be done, then illegal delegates would be exercising the same power in convention as legal delegates, and the convention would be recognizing as legal delegates, delegates not elected according to the laws

of this state.  Evidence has been introduced as to the reason
for the withdrawal of legal delegates from the Dubois con-
vention, presided over by McKinley, and from this evidence
it clearly appears that neither the state central committee
nor the convention, as composed of the delegates placed upon
the roll by said state central committee, would recognize or
permit legally elected delegates to such convention to partici-
pate therein.  Inasmuch as the law fixes the method by which
delegates shall be elected to a state convention, we must
conclude that the lawmakers intended to make such legally
elected delegates constitute the convention, and if the legally
elected delegates do constitute the convention, then we see
no reason why a majority of such legally elected delegates
should not have the right and power to control such con-
vention and its entire proceedings.  If, in order to exer-
cise this legal right, it becomes necessary for such legal ma-
jority of delegates to assemble as such organization, either
in a hall where illegal delegates are participating with a legal
minority, or to go hence and gather together in some other
hall, they would have a right to do so.  The majority of a
convention would seem to have a right to dissolve or termi-
nate the convention at will, to displace and remove the officers
of such convention, and to elect the officers to preside over
the deliberations of such convention.  They have power, in
the absence of a statute, to adopt their own rules and regula-
tions, and the courts will recognize and affirm the legal ac-
tions of a legally constituted convention composed of dele-
gates elected according to law.

Taking this view of the matter makes it unnecessary to
enter into a full discussion of the details and incidents of
the state central committee and the Dubois convention up un-
til the time the majority of the legal delegates attending
such convention were in a position to control the acts of
such convention.  Whether or not protests and contests were
filed before the state central committee or presented to the
convention in such form as the central committee and conven-
tion would entertain, becomes of no consequence, in view of
the fact that the central committee or the convention had no

power or authority to deny the right to participate in the deliberations thereof of delegates attending said convention elected according to the laws of this state.

It is shown by the record in this case that legal delegates were in attendance at said convention from Ada, Fremont, Bear Lake and Oneida counties, attempting to be recognized as such by the Dubois convention, and when they were unable to be recognized as such, they were permitted and did participate in the convention presided over by McClear, composed of delegates elected to said convention according to law. There is nothing in the authorities to which counsel has directed our attention to the contrary. Those were cases under the common-law rule as to assemblages generally, where no particular or legal qualifications of the members were fixed by law.

It follows that as the anti-Dubois convention, presided over by McClear, was composed of a majority of the legal delegates elected to the Democratic state convention, held at Wallace, Idaho, on August 4, 1908, it therefore was the Democratic state convention, and a ticket nominated by such convention and certified to as required by law should and will be recognized as the state Democratic ticket entitled to be filed and certified to the various county auditors to be printed on the official ballot at the general election to be held on November 3, 1908.

Judgment is ordered entered for defendant, the prayer of the petitioner is denied and the cause dismissed. Costs awarded to the defendant.

Ailshie, C. J., and Sullivan, J., concur.